UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
VLADISLAV BABIN,

                          Plaintiff,

     -against-

DEPARTMENT OF THE TREASURY,

                         Defendant.

-------------------------------------------------------------------x

**REPORT AND RECOMMENDATION**
20-cv-2702 (JMA)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this employment discrimination-civil rights litigation, on referral from the Honorable Joan M. Azrack for Report and Recommendation, is Defendant Department of the Treasury's ("Defendant" or the "Department") motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). *See* Defendant's Notice of Motion for Judgment on the Pleadings ("Defendant's Motion" or "Def. Mot."), Docket Entry ("DE") [28]. By way of Complaint dated October 4, 2019, later modified by an Amended Complaint dated August 21, 2020, and again by a Second Amended Complaint dated August 26, 2020, Plaintiff *pro se* Vladislav Babin ("Plaintiff" or "Babin") commenced this action against Defendant pursuant to 5 U.S.C. § 7703(b)(2): (1) seeking review of the Merit Systems Protection Board's (the "MSPB") decision affirming the Department's decision to remove him from federal employment as a bank examiner; and (2) alleging causes of action for disability discrimination and retaliation. *See* Complaint ("Compl."), DE [1-4]; Amended Complaint ("Am. Compl."), DE [11]; Second Amended Complaint ("SAC"), DE [12]. Defendant denies any

1

liability. *See* Answer ("Ans."), DE [19]. For the reasons set forth below, the Court respectfully recommends that Defendant's Motion be granted in its entirety and that the Second Amended Complaint be dismissed with prejudice and without leave to replead.

## I.     BACKGROUND

### A. <u>Documents Considered by the Court</u>

In light of the liberal pleading standard applicable to *pro se* civil rights complaints in this Circuit, *see Thompson v. Carter*, 284 F.3d 411, 419 (2d Cir. 2002), the Court draws the following facts from the original Complaint and Amended Complaint, as well as their respective attachments, to the extent such allegations are not repeated in the Second Amended Complaint. *See Washington v. Westchester Cnty. Dep't of Correction*, No. 13-cv-5322, 2015 WL 408941, at *1, n. 1 (S.D.N.Y. Jan. 30, 2015) ("[G]iven Plaintiff's *pro se* status,…the Court will consider facts from the Plaintiff's Complaint…that have not been repeated in the Amended Complaint." (citations omitted)); *see also Fleming v. City of New York*, No. 10-cv-3345, 2014 WL 6769618, at *3 (S.D.N.Y. Nov. 26, 2014) (quoting *Camarano v. City of New York*, 624 F. Supp. 1144, 1147-48 (S.D.N.Y. 1986) ("Since *pro se* civil rights complaints should be read with…generosity, [Plaintiff's original] complaint must be given the benefit of incorporation." (alterations in original))).

The Court also considers Administrative Law Judge Nicole DeCrescenzo's Initial Decision affirming Babin's removal from federal service (the "Decision" or "Dec."), *see* DE [30-1] (attached to the Declaration of Robert W. Schumacher

("Schumacher Decl."), DE [30], as Exhibit ("Ex.") A), because Plaintiff's Complaint, Amended Complaint, and SAC repeatedly reference the Decision, *see generally* Compl; Am. Compl.; SAC, and materials referenced therein are properly considered at this juncture. *See Schine by Short v. New York State Off. for People with Dev. Disabilities*, No. 15-cv-5870, 2017 WL 9485650, at *3 (E.D.N.Y. Jan. 5, 2017), *report and recommendation adopted*, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017) (citing *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); *Tomassi v. Sheehan*, No. 15-cv-3605, 2016 WL 4768826, at *1 (E.D.N.Y. Aug. 23, 2016), *report and recommendation adopted*, 2016 WL 4767539 (E.D.N.Y. Sept. 13, 2016)) (Rule 12(c) permits the court to consider not only the complaint, but also the answer, including affirmative defenses; attached written documents; and "any matter of which the court can take judicial notice for the factual background of the case.").

## B. **Plaintiff's Initial Employment**

In 2016, the Office of the Comptroller of the Currency (the "OCC"), a bureau within the Department, appointed Plaintiff to serve as a bank examiner (field examiner), grade NB-0570-6, in its Charlotte, North Carolina office. *See* Dec. at 1. Within about a year of his start, Babin's then-supervisor[1] informed his superior, Morris Morgan ("Morgan"), that Plaintiff's personality was negatively affecting his performance. *Id.* At that time, Babin expressed a desire to transfer to the OCC's short-staffed New York field office. *Id.* at 2. Morgan, working through the

---

[1] The parties have not provided the name of Babin's immediate supervisor during his time at the OCC's Charlotte office.

intervening chain of command, effected Plaintiff's transfer to New York in or about May 2017. *Id.*

Babin's direct supervisor in the OCC's New York officer was Mike Kirk ("Kirk"), who initially assigned Plaintiff "to educate himself on the office's policies, projects, and resources, and to do simple projects related to the competencies in his resume." *Id.* Kirk apparently told Babin that he "would have a clean slate in New York," and that Kirk "would not even read [Plaintiff's] prior year evaluation." *Id.* Kirk was on leave for most of the summer of 2017, during which time Babin was supervised by Kirk's designees, Laura Santini ("Santini'), Geralynn Batista ("Batista"), and Andrew Hollings ("Hollings"). *See id.* During this time, Plaintiff was assigned to work on a new product review with Santini, who reported that Plaintiff's work product was "untimely" and "did not show original analysis." *Id.* She discovered that Babin had impermissibly "cut and pasted" significant information, and further concluded that Plaintiff "lacked understanding [as to] how to conduct the review" but was "reluctant to seek assistance." *Id.*

On September 4, 2017, Kirk assigned Babin to a two-week examination, where he was supervised by Hollings. *Id.* On September 7, 2017, Plaintiff advised Kirk that he felt underutilized. *Id.* On September 18, 2017, Kirk assigned Babin to work on an examination of the Commonwealth Bank of Australia ("CBA"). *See id.* at 3. Batista and Stephen Lethem ("Lethem") supervised Plaintiff on the CBA project, and both reported specific concerns regarding his knowledge base and ability to perform the necessary work. *Id.* On September 26, 2017, Babin advised Lethem that he was

ill, but would "work from home" rather than request leave. *Id.* Plaintiff missed work for medical reasons on September 26 and 27, 2017, and went on vacation to Japan the following week, beginning on September 30, 2017. *Id.* When Babin returned, he was removed from the CBA assignment. *Id.*

On October 24, 2017, Kirk met with Plaintiff and informed him that his work up to that point had been assessed as poor. *Id.* Kirk advised Babin that it was not acceptable that he had "cut and pasted" from prior self-evaluations without sufficient analysis, and that Plaintiff's conduct – specifically his personal time and attendance reporting – was questionable. *Id.* Babin was "highly insulted" and denied all of Kirk's claims. *See id.* Kirk and Plaintiff met about these issues on October 24, October 31, and November 1, 2017. *Id.* During these meetings, Kirk advised Babin that he was not observed at his workspace often enough, and that his work product "continued to include liberal borrowing of text from other documents." *Id.* Kirk subsequently gave Babin a rating of "minimally successful," expressed as 2 out of 4, for the 2017 rating year.

On January 2, 2018, Kirk emailed Plaintiff to ask why he had not attended any of the required trainings scheduled in December 2017. *See id.* at 4. The pair met again regarding this topic on January 17, 2018, which Kirk memorialized in writing. *Id.* On or about January 4, 2018, Babin requested a disability accommodation, which Kirk approved. *See id.* Plaintiff was granted a "gliding start," which allowed him to start his shift between 5:30 and 7:30 a.m. without additional approval, and as late as 9:30 a.m., with additional approval. *See id.* Kirk also specifically advised Plaintiff

5

that he would still be responsible for adhering to the OCC's conduct and performance standards, and recommended that Babin enroll in a job-specific writing class. *Id.*

In mid-January, Plaintiff enrolled in the recommended writing class. *Id.* Despite instructions to bring an original writing sample, Babin brought another person's writing sample to work on in the class. *See id.* When confronted by Kirk, Plaintiff claimed that he did not know that he was supposed to bring his own writing to the class. *Id.* On February 1, 2018, after he had lost confidence that Babin could perform in his position, Kirk assigned Plaintiff to draft a personal performance improvement plan and warned that, at that point, his performance was unacceptable in all respects. *See id.* Babin missed work on February 13 and 14, 2018 for medical reasons. *Id.* at 5. On February 13, Plaintiff sent a text message to his coworker, Ria Tardieu, informing her that he had been hospitalized and would not be at work the next day, and directing her not to tell Kirk about their exchange. *Id.*

### C. Plaintiff's Harassment Claim

In March 2018, Plaintiff complained to Gregory Coleman ("Coleman"), a high-ranking OCC official, that Kirk had been harassing him since October 2017. *See id.* Coleman immediately placed Babin on full-time telework, assigned him to report directly to Kirk's supervisor, Greg Sullivan ("Sullivan"), and hired an independent investigator to review Plaintiff's allegations. *See id.* During the investigation, Babin circulated numerous emails within the OCC, levying unsupported and frivolous charges against his supervisors. *See id.* at 14-20. Plaintiff contacted the Equal Employment Opportunity Commission ("EEOC") in February 2018, allegedly filed a

disability discrimination charge on April 20, 2018, and a retaliation charge on May 8, 2018. *See generally* Dec.[2]  On April 30, 2018, the OCC's outside investigator completed her investigation, and found Babin's allegations to be unsubstantiated. *Id.*

## D. **Plaintiff's Removal from Federal Service**

On May 21, 2018, the OCC proposed Plaintiff's employment be terminated, based on four charges related to his conduct and performance. *See* Notice of Proposed Removal (the "Notice"), DE [30-5] (attached to Schumacher Decl. as Ex. E).  According to the Notice, the OCC's bases for Babin's removal were:

- Failure to Follow Instructions: eight instances of written directives, which Plaintiff ignored;

- Use of Insolent or Disrespectful Language: eleven instances of unacceptable language used by Babin, including false claims that, *inter alia*, his supervisors were "unstable," "insane," and "a time bomb";

- Improper Conduct: 13 instances of Plaintiff, among other things, circulating false claims against his supervisors within the OCC, to individuals without responsibility for Plaintiff's supervision; and

- Unacceptable Performance of Duty: four instances of Babin refusing to adhere to discrete directives in order to complete assignments.

*See* Dec. at 7-33.

Plaintiff, acting through his union, filed a written reply to the Notice. *See* Dec. at 5.  The OCC's proposal to remove Babin, as well as his reply, were referred to Morgan, the OCC's then-Senior Deputy Comptroller for Large Bank Supervision, for resolution. *See id.*  On June 21, 2018, Morgan sustained the above four charges

---

[2] Plaintiff apparently abandoned his EEOC charges in order to appeal his removal from federal service to the MSPB. *See generally* Pl. Opp.; Dec.

against Plaintiff, and ordered his removal from federal service. *Id.*; *see also* Schumacher Decl. Ex. F (Morgan's Removal Decision).

### E.  **Plaintiff's Appeal and MSPB Hearing**

Plaintiff subsequently appealed Morgan's decision to the MSPB. *See* Dec. at 5. On June 27, 2019, the ALJ conducted an evidentiary hearing, wherein Babin, then represented by counsel, was given the opportunity to engage in full discovery. *See generally* Dec.  The hearing included submission of written exhibits, live witness testimony and cross-examination. *Id.*  Before the hearing, the parties and the MSPB identified seven issues to be decided through the proceeding, whether:  (1) Babin failed to properly follow specific instructions; (2) Plaintiff used disrespectful or insolent language; (3) Babin engaged in specified improper conduct; (4) Plaintiff's job performance was unacceptable; (5) Babin's removal from federal employment was a reasonable penalty; (6) Plaintiff would not have been removed but for the OCC's failure to accommodate his disabilities or grant him an accommodation that would have allowed him to satisfactorily perform the essential functions of his job; and (7) Morgan's decision to remove Babin from federal employment was motivated by his disability or prior EEO activity. *See id.* at 5-6.

### F.  **The ALJ's Decision**

On July 3, 2019, the ALJ issued her Decision, wherein she found that the OCC had met its burden of proving all four charges brought against Plaintiff.  As to the first charge of "Failure to Follow Instructions," the OCC brought eight specifications

against Babin, each of which were initially sustained by Morgan, and seven of which were affirmed by the ALJ. *See* Dec. at 14. Those specifications were:

- Specification #1: On January 2, 2018, Kirk requested to meet with Babin, which he declined, and replied, "No Mike, no more talking today." Plaintiff declined an additional request to meet that day;

- Specification #2: Babin failed to submit a remedial performance improvement plan, despite being instructed by Kirk to do so on December 18, 2017, and January 2, 17, and 19, 2018[3];

- Specification #3: On January 8, 2018, Plaintiff was assigned to meet with and mentor Jennifer Creedon ("Creedon"), a new OCC employee, prior to completion of her assigned task. Babin did not contact Creedon until she had completed the task and presented her work;

- Specification #4: Throughout January 2018, Plaintiff failed to escalate a matter requiring attention to Kirk, after having been instructed to do so on December 14, 2017, and other occasions prior;

- Specifications #5-6: Babin failed to attend mandatory team meetings on April 3 and 10, 2018, despite explicit instructions from his supervisor;

- Specification #7: Plaintiff continued to disparage and disrespect the OCC's management and staff, despite explicit emails received April 5 and 11, 2018, instructing him not to do so; and

- Specification #8: On May 3, 2018, contrary to the emails addressed in Specification #7, Babin emailed Coleman stating, in part: "Are you sure it was a good idea for me to report to Mike Kirk again? The guy is clearly unstable. All he does is creates [*sic*] liability for the OCC and for you. One of these days he is going to snap and he is going to do something outrageous again (cursing, grabbing, etc.)."

*See* Dec. at 7-14. In doing so, the ALJ considered: (i) live testimony from Plaintiff and Kirk; (ii) emails from Kirk, Plaintiff, Creedon, Santini, and Sullivan; (iii) Babin's

---

[3] The ALJ declined to sustain this specification because Kirk testified at the hearing that, although Babin's draft remedial performance improvement plan was "lazy and lacking in substance and insight," Kirk received it. *See* Dec. at 9.

admissions that the third through seventh specifications were true; and (iv) other internal OCC memoranda and documents. *See id.* at 9-14.

As to the second charge of "Disrespectful or Insolent Language," the OCC brought 11 specifications against Babin, all of which were initially sustained by Morgan and affirmed by the ALJ. *See* Dec. at 20. Those specifications were:

- <u>Specification #1</u>: In a December 15, 2017 email to Sullivan, Babin stated that Kirk had "overreacted and he said things that he shouldn't have said and he did things that he shouldn't have done[,]" but that Kirk would not admit what he had done "because his ego is a [*sic*] size of Manhattan Island….";

- <u>Specification #2</u>: On January 2, 2018, Kirk requested that Plaintiff come to Kirk's office when he returned, to which Babin replied:  "Sorry that I missed you…Sometimes I have to use the restroom, sometimes I go to the kitchen to get some coffee/tea, and sometimes I go out to get lunch. I hope that's OK….";

- <u>Specification #3</u>: In a February 18, 2018 email to Sullivan, Coleman, and Morgan, Babin questioned why the recipients were "cover[ing]" for Kirk despite Kirk's alleged harassment Plaintiff.  Babin also characterized Kirk as a "time bomb and future [l]iability for the OCC" with an ego "the size of Manhattan Island….";

- <u>Specification #4</u>: In a February 19, 2018 email to Morgan, Plaintiff stated, in part**:**  "I almost had a heart attack a few days ago and nobody in the OCC cares or does anything about it.  I was in ICU, hooked up to all kinds of medical equipment, on Thursday.  Meanwhile my lunatic boss was typing me 3-page emails, saying that my absence was AWOL. Is he completely insane?";

- <u>Specification #5</u>: In a March 27, 2018 email to Sullivan, Plaintiff stated, in part:  "Do you tell your wife when you go home - Honey, I harassed one of my sick employees today and I feel great about it!  Do you know that I have two little kids?... [*sic*] and 2 years old…Do you have kids, Greg?  The ace lawyers are talking to my lawyer…I am on my way out of the OCC….  Thank God for hat! [*sic*] My former supervisor is unstable. He shamed me and cursed at me in front of other people, and he tried to grab me…I reported him and now the OCC is trying to crucify me

because I didn't want to play along with that…You will have more problems with that individual….";

- Specification #6: In an April 2, 2018 response to Sullivan's request that Babin submit two overdue work product as soon as possible, Plaintiff stated, in part: "I overestimated you Greg. Once again – why are you doing this? What are you trying to accomplish by picking up that harassment torch from Mike (those made-up deadlines and 'busy work' assignments)[?]" and accused Sullivan of "join[ing Kirk] on that path of harassment.";

- Specification #7: In an April 4, 2018 email to Coleman, Plaintiff again accused Coleman of "join[ing Kirk] on that path of harassment" and claimed that Kirk "[came] up with some made up deadlines and 'busy work' assignments, which have no value to anybody…."; and

- Specifications #8-11: Babin emailed over two dozen people, including his fourth-level supervisor as well as lower-ranked colleagues under Kirk's supervision, regarding Kirk's alleged harassment of Plaintiff.

See Dec. at 14-20.  In reaching her decision, the ALJ considered testimony from Plaintiff and Kirk, as well as emails between Babin, Kirk, Sullivan, Santini, and other internal OCC emails and documents.  See id. at 20.

As to the third charge of "Improper Conduct," the OCC brought 13 specifications against Plaintiff, each of which were initially sustained by Morgan, and affirmed by the ALJ.  See Dec. at 29.  Those specifications were:

- Specification #1: In a February 13, 2018 email, Babin represented to his supervisors that he had met with and offered to assist Creedon, and criticized her for declining this assistance, despite never doing so;

- Specification #2: On February 1, 2018, Kirk asked Plaintiff "specific, sequential questions about" his failure to submit a remedial performance improvement plan, Babin's "understanding of the instructions [he] received, and about [his] awareness of the consequences for not following supervisory instructions," to which Plaintiff repeatedly answered: "I don't know; I don't have an answer.";

- Specification #3: On February 18, 2018, Babin emailed Sullivan, Coleman, and Morgan, alleging that on November 29, 2017, Kirk had, "told [Plaintiff] that he changed his mind about me pursuing the UCE[4] Program. I still do not understand the logic of it….";

- Specification #4: On February 18, 2018, Babin emailed Sullivan, Coleman, and Morgan, inaccurately claiming that he (Plaintiff) "never received any negative feedback" from Kirk or Kirk's deputies (Santini, Batista, Neal Moran ("Moran"), or Adam Glassman) prior to October 24, 2017, and that on October 31, 2017, Kirk called Babin into his (Kirk's) office, gave Plaintiff a negative performance review and used the word "fuck" several times during that review, including to tell Babin, "You have to do your fucking job.";

- Specification #5: On February 18, 2018, Plaintiff emailed Sullivan, Coleman, and Morgan, alleging that on November 1, 2017, Kirk gave Babin another negative performance review, this time in front of Santini and Batista, and told Plaintiff that he was "overpaid.";

- Specification #6: On March 6, 2018, Kirk asked Babin to come to Kirk's office to discuss Plaintiff's time sheet. Upon arrival at Kirk's office, Babin refused to speak with Kirk without a witness, whom Plaintiff insisted had to be an OCC management official;

- Specification #7: On March 13, 2018, Kirk approached Babin's work station to discuss Plaintiff's time sheet and the requirements of his accommodation agreement. Babin did not remove his earphones until asked to do so, refused to speak to Kirk, demanded multiple times to have representation, and left his work station while Kirk was sitting there, without speaking to Kirk;

- Specification #8: On or about March 18, 2018, Babin contacted the third-party investigator conducting the inquiry into his allegations against Kirk in an attempt to have a conversation just "as two human beings talking to each other," and not "on the record." When the investigator explained that she was obligated to document any information Plaintiff provided regarding his allegations, he stated that he knew "what was going on" and wanted to share it but "just as human beings talking to each other." When the investigator repeated that she could not have any "off the record" discussions, Babin declined to speak and commented "I'm willing to tell you but if you don't want to hear it….";

---

[4] The parties do not define this acronym. *See* Dec.; Pl. Opp.

- <u>Specification #9</u>: On April 2, 2018, Plaintiff emailed the OCC's capital markets exam team with an attachment that contained an inaccurate list of allegations regarding Kirk's conduct;

- <u>Specification #10</u>: Around March/April 2018, during the harassment inquiry, he twice attempted to initiate substantive discussions about the inquiry with David Morello ("Morello"), an inquiry witness, despite direction from the investigator to refrain from doing so. During one overture, despite a reminder from Morello that they should not speak about the inquiry, Plaintiff suggested that they "pretend as if the discussion never happened"; and

- <u>Specifications #11-13</u>: On or about April 20, 2018, Babin emailed a large group of OCC senior managers a list of baseless allegations against Kirk, when the recipients were not involved in and had no influence over the subject matter in the attachment. Babin sent this attachment on April 24, 2018, to: (1) all Large Bank Supervision Deputy Comptrollers, except Coleman; and (2) the OCC's Executive Committee (including Morgan), Chief Risk Officer, and the Comptroller of the Currency.

*See* Dec. at 20-29. In affirming Morgan's decision, the ALJ took into account: (i) live testimony from Babin, Kirk, and Morgan, including Plaintiff's admissions that the third through seventh specifications were correct; and (ii) emails from Kirk, Plaintiff, Morgan, Morello, Creedon, Santini, and Sullivan. *See id.*

As to the fourth charge of "Unacceptable Performance," the OCC brought four specifications against Plaintiff, each of which were initially sustained by Morgan, and affirmed by the ALJ. *See* Dec. at 33. Those specifications were:

- <u>Specification #1</u>: On or about November 16, 2017, Kirk asked Babin to complete a bank review and submit his recommendation by November 27, 2017. Not only did Plaintiff submit his assignment on December 1, 2017, but he "cut and pasted virtually all of the conclusions from the bank's Internal Audit Department's work-papers, rather than providing [his] own analysis of the information the bank had provided and [his] own conclusions." Further, Despite Kirk's instruction to submit a corrected and complete analysis by the close of business on February 12, 2018, Babin never submitted a revised assignment;

13

- Specification #2: On March 8, 2018, Plaintiff submitted another draft assignment to Eliana Georgiou ("Georgiou"), his project supervisor, and Hollings, in which Babin "cut and pasted information that [he] received from another regulator." Notwithstanding a request from Georgiou to provide original analysis and detail, Plaintiff failed to revise his assignment to do so, and other examiners had to complete the project;

- Specification #3: On or about March 15, 2018, Babin was assigned to complete an assignment within two working days. On or about March 21 and March 26, 2018, Sullivan notified Plaintiff that the assignment was overdue, and requested that Babin submit it. Sullivan reiterated this request on April 2, 2018. On April 2, 2018, Plaintiff committed to submitting the assignment upon his return from sick leave, from which he returned on April 24, 2018. On May 7, 8, and 9, 2018, Kirk requested that Babin submit "whatever work [he] had completed" on the assignment. Plaintiff never submitted the assignment; and

- Specification #4: On or about April 2, 2018, Babin was assigned to prepare a scope memorandum ("SM") for the "2018 Volcker Rule - Independent Testing Review." On April 20, 2018, Plaintiff submitted his draft SM to Hollings, with copies to Sullivan, Morella, Moran, Batista, and Santini, for review. On April 24, 2018, Santini forwarded the draft to Kirk, who requested that Babin revise the draft in accordance with specific comments and guidance from Kirk and Hollings. Nevertheless, Plaintiff submitted another draft on May 4, 2018, that was virtually identical to his earlier drafts. Because of Babin's failure to implement the requested corrections, the assignment was incomplete, and his team was unable to use his SM.

*See* Dec at 30-33. The ALJ based her assessment off of Kirk's testimony, emails containing criticism and critique of Babin's work product, and Plaintiff's admissions at the hearing that he drafted subpar work product. *See id.*

The ALJ noted that Babin had failed to offer any defense to many of the specific allegations, and ruled that his removal was reasonable. *Id.* at 33-34. In rejecting Plaintiff's disability discrimination claim, the ALJ highlighted Babin's testimony that he had received the only accommodation that he had requested. *Id.* at 34-37. The ALJ also noted Plaintiff's argument was undercut by his testimony that he was

14

"willing and able to perform all the duties related to [his] position as a Bank Examiner with the accommodation…which [he had] been granted by the OCC and [his] OCC supervisors[,]" as well as his failure to show substantial limitation in any major life activity.   *Id.* at 35-36.   The ALJ also heard and observed Morgan's testimony and credited his assertion that Plaintiff's medical condition and prior EEO activity played no role in his decision to remove Plaintiff.   *Id.* at 37.   Finally, the ALJ noted that Babin had testified that Morgan had mentored him and treated him fairly, and that Plaintiff had produced no evidence to support a claim of Morgan retaliating or discriminating against him.   *Id.* at 37-38.

### G. Procedural History

Based on the above facts, Plaintiff, now proceeding *pro se*, filed an appeal of the Decision with the Court of Appeals for the Federal Circuit in or around September 2019.   *See* DE [30-2].   The Federal Circuit, however, lacked jurisdiction to hear Babin's appeal pursuant to *Perry v. Merit Systems Protection Bd.*, _ U.S. _, 137 S. Ct. 1975, 1977-79 (2017), and transferred the matter to this Court.   *See* DE [30-2].   After the parties' August 11, 2020 initial conference, Babin was permitted to file his Amended Complaint and Second Amended Complaint, *see* Am. Compl.; SAC, to which the Department filed its Answer on December 23, 2020.   *See* Ans.   On March 23, 2021, Defendant moved for judgment on the pleadings, *see* Def. Mot., which Plaintiff opposed.   *See generally* Plaintiff's Opposition to Defendant's Motion ("Pl. Opp." or "Plaintiff's Opposition"), DE [32].   For the reasons set forth below, the Court respectfully recommends that Defendant's Motion be granted in its entirety and that

the Second Amended Complaint be dismissed with prejudice and without leave to replead.

## II.    LEGAL STANDARDS

### A. <u>Judicial Review of MSPB Decisions</u>

Under the Civil Service Reform Act of 1978, 5 U.S.C. §§ 7701 *et seq.*, qualified federal employees may appeal certain adverse employment decisions to the MSPB. *See Murray v. U.S. Dep't of Justice*, 821 F. Supp. 94, 101 (E.D.N.Y. 1993), *aff'd*, 14 F.3d 591 (2d Cir. 1993).   Regardless of whether a case involves merely ordinary personnel action, or is a "mixed case" – one that involves an ordinary personnel action coupled with an allegation that the action was discriminatory or retaliatory – the MSPB must sustain an agency's adverse employment decision if that decision is supported by a preponderance of the evidence.   *See* 5 U.S.C. § 7701(c)(2).   While petitions for judicial review of an adverse MSPB decision in ordinary personnel cases are heard by the Court of Appeals for the Federal Circuit and reviewed solely on the administrative record, *see* 5 U.S.C. § 7703(b)(1), 7701(c)(1)-(3), judicial review of "mixed cases" lies with the district court.   *See* 5 U.S.C. § 7703(b)(2).

The scope of judicial review of an ordinary personnel MSPB decision is narrowly defined by 5 U.S.C. § 7703(c).   A reviewing Article III court must affirm an ordinary personnel MSPB decision unless it was:  "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedure required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence."  *Valenzuela v. Dep't of the Treasury*, 799 Fed. App'x 879, 880

(Fed. Cir. 2020) (quoting 5 U.S.C. § 7703(c)).  In this context, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Weathersbee v. Dep't of the Treasury*, 672 Fed. App'x 997, 998-99 (Fed. Cir. 2017) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *see also Jenkins v. Dep't of Transp.*, 824 Fed. App'x 1028, 1032 (Fed. Cir. 2020) (citing *Carroll v. Dep't of Health & Human Servs.*, 703 F.2d 1388, 1390 (Fed Cir. 1983) ("The [MSPB's] decision must be sustained when a rational basis exists for its conclusions.")).  The scope of review for affirmative claims brought under mixed cases, however, is *de novo.  See* 5 U.S.C. § 7703(c); *see also Figueroa v. Nielsen*, 423 F. Supp. 3d 21, 28 (S.D.N.Y. 2019); *Fineman v. United States Postal Service,* 555 F. Supp. 1336, 1341 (S.D.N.Y. 1983).

In order to prevail on an MSPB appeal, the Government must make three showings.  First, it must prove by a preponderance of the evidence that the charged conduct occurred.  *See* 5 U.S.C. § 7701(c)(1)(B); *Pope v. U.S. Postal Serv.*, 114 F.3d 1144, 1147 (Fed. Cir. 1997).  Second, the agency must show a "nexus between [the charged conduct] and efficiency of service."  *Pope*, 114 F.3d at 1147 (citing 5 U.S.C. § 7513(a)).  Third, the agency must establish the reasonableness of the punishment.  *Pope*, 114 F.3d at 1147 (citing *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 306-07 (1981)).  Pursuant to 5 U.S.C. § 7703(c), this Court must affirm the Decision unless any of its findings are found to be arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence.  *See Kasten v. MSPB*, 687 Fed. App'x 42, 43 (2d Cir. 2017); *see also Figueroa*, 423 F. Supp. 3d at 28-29.  The

petitioner has the burden of establishing error in the MSPB's decision. *See Kent v. Dep't of the Air Force*, 524 Fed. App'x 614, 616 (Fed. Cir. 2013) (citing *Harris v. Dep't of Veterans Affairs,* 142 F.3d 1463, 1467 (Fed. Cir. 1998)).

## B. Fed. R. Civ. P. 12(c)

Pursuant to Fed. R. Civ. P. 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard for addressing a Rule 12(c) motion mirrors that for a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Hogan v. Fischer*, 738 F.3d 509, 514-15 (2d Cir. 2013) (citation omitted). To survive a motion to dismiss pursuant to either Rule 12(b)(6) or Rule 12(c), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1975 (2007)). A claim is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (citation omitted). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Dargahi v. Honda Lease Trust*, 370 Fed. App'x 172, 174 (2d Cir. 2010) (internal quotation marks and citation omitted); *Nathaniel v. City of N.Y.*, No. 16-cv-256, 2017 WL 3912986, at *1 (E.D.N.Y. Sept. 6, 2017) (citations omitted).

18

### C. *Pro Se* Pleadings

It is well-established that pleadings by *pro se* plaintiffs are held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S. Ct. 173, 176 (1980); *see also Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (internal citations omitted).  The Second Circuit has held that a court reviewing a *pro se* pleading must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of Educ. of the City of New York*, 287 F.3d 138, 146 (2d Cir. 2002) (internal alterations omitted); *see also Rene v. Citibank N.A.*, 32 F. Supp. 2d 539, 541 (E.D.N.Y. 1999) (holding that a court must "make reasonable allowances so that…*pro se* plaintiffs do not forfeit their rights by virtue of their lack of legal training").  However, the court "need not argue a *pro se* litigant's case nor create a case for the *pro se* which does not exist." *Ogunmokun v. Am. Educ. Servs./PHEAA*, No. 12-cv-4403, 2014 WL 4724707, at *3 (E.D.N.Y. Sept. 23, 2014) (quoting *Molina v. New York*, 956 F. Supp. 257, 259 (E.D.N.Y. 1995)).

### III.  DISCUSSION

Applying the standards set forth above, and for the reasons set forth below, the Court respectfully recommends that Defendant's Motion be granted in its entirety and that the Second Amended Complaint be dismissed with prejudice and without leave to replead.

### A. **Affirmation of the MSPB Decision**

    1.  Proof of Charged Conduct

Initially, Babin urges the Court to reject the ALJ's Decision, because the analysis "was not based on complete and relevant information" as Plaintiff "was denied discovery and witnesses." *See* Pl. Opp. at 10. The standard of review, however, is not whether the Department met its burden of proof, but whether the ALJ's conclusion that Defendant met that burden was based on substantial evidence. 5 U.S.C. § 7703(c)(3); *see also Figueroa*, 423 F. Supp. 3d at 29. A review of the ALJ's reasoning demonstrates that her findings regarding each of the charges are supported by substantial evidence, and that the Department has established Babin's conduct by a preponderance of the evidence.

    a.  *Failure to Follow Instructions*

To prove a charge of failure to follow instructions, the agency must establish that the appellant was given proper instructions, and he failed to follow the instructions, without regard to whether the failure was intentional or unintentional. *See Archerda v. Dep't of Def.*, 121 M.S.P.R. 314, 321-22 (2014) (citing *Hamilton v. U.S. Postal Serv.*, 71 M.S.P.R. 547, 556 (1996)). Eight specifications of this charge were brought against Plaintiff and substantiated by Morgan, and seven were affirmed by the ALJ. *See generally* Dec. In affirming the seven specifications, the ALJ considered live testimony from Plaintiff and Kirk, as well as emails from Kirk, Plaintiff, Creedon, Santini, Sullivan, and other internal OCC memoranda and documents. *See id.* at 14. The ALJ further considered Babin's admissions that the third through seventh

specifications were true. *See id.* at 9-14. For these reasons, the Court concludes that the ALJ's decision regarding the failure to follow instructions charge against Babin was supported by substantial evidence. *See Tompkins v. U.S. Postal Serv.*, 415 Fed. App'x 226, 228 (Fed. Cir. 2011) (citing *Lachance v. Merit Sys. Prot. Bd.,* 147 F.3d 1367, 1371 (Fed. Cir. 1998) (internal citation and quotations omitted) ("[W]here more than one event or factual allegation is set out to support a single charge," proof of one or more of the supporting specifications "is sufficient to sustain the charge.")).

> b. *Disrespectful or Insolent Language*

An agency can sustain a "disrespectful or insolent" language charge by establishing that an employee used language considered by an ALJ to be "disrespect[ful] toward a supervisor." *Higgins v. Dep't of Veterans Affairs*, 955 F.3d 1347, 1351-52 (Fed. Cir. 2020). An ALJ's credibility determinations (*i.e.* – whether an employee's language was insolent or disrespectful at the time) are "virtually unreviewable on appeal." *Schultz v. U.S. Postal Serv.*, 323 Fed. App'x 912, 916 (Fed. Cir. 2009) (quoting *King v. Dep't of Health & Human Servs.,* 133 F.3d 1450, 1453 (Fed. Cir. 1998)). Morgan and the ALJ affirmed each of the 11 specifications of this charge brought against Plaintiff. *See* Dec. at 14-20. The ALJ considered testimony from Plaintiff and Kirk, as well as emails between Babin, Kirk, Sullivan, Santini, and other internal OCC emails and documents. *See id.* at 20. Based on this analysis, the Court concludes that the ALJ's decision as to the 11 specifications of failure to follow instructions charged to Babin were supported by substantial evidence.

### c. *Improper Conduct*

An agency may sustain an improper conduct charge by establishing that an employee lacked candor towards his or her supervisors. *See Saunders v. U.S. Postal Serv.*, 310 Fed. App'x 396, 400, n.1 (Fed. Cir. 2009) (citing *Lachance,* 147 F.3d at 1371). An agency also need not show an employee's specific knowledge in order to establish improper conduct. *See Holdsworth v. U.S. Postal Serv.*, 469 Fed. App'x 871, 874 (Fed. Cir. 2012) (citing *Rogers v. Dep't of Just.,* 60 M.S.P.R. 377, 388-89 (1994)).

Thirteen specifications of this charge were brought against Plaintiff, and affirmed by Morgan and the ALJ. *See generally* Dec. In affirming Morgan's decision, the ALJ considered live testimony from Plaintiff, Kirk, and Morgan as well as emails from Kirk, Plaintiff, Morgan, Morello, Creedon, Santini, Sullivan, and other internal OCC documents. *See id.* at 14. The ALJ further considered Babin's admissions that the third through seventh specifications were correct. *See id.* at 20-29. For these reasons, the Court concludes that the ALJ's decision as to the 13 specifications of improper conduct charged to Babin were supported by substantial evidence.

### d. *Unacceptable Performance*

In order to sustain an unacceptable performance charge, an agency need only demonstrate that an employee has failed to meet "established performance standards in one or more critical elements of such employee's position." *Brenner v. Dep't of Veterans Affairs*, 990 F.3d 1313, 1317 (Fed. Cir. 2021) (quoting 5 U.S.C. § 4301(3)). Here, the OCC brought four specifications of this charge against Plaintiff, each of which were sustained by Morgan and affirmed by the ALJ on appeal. *See* Dec. at 30-

33. The ALJ based her assessment off of Kirk's testimony, emails containing criticism and critique of Babin's work product, and Plaintiff's admissions at the hearing that he drafted subpar work product. *See id.* For these reasons, the Court concludes that the ALJ's decision regarding this charge was supported by substantial evidence.

## 2. Nexus Between Charged Conduct and Efficiency of Service

The Department must next establish by a preponderance of the evidence that there is a "nexus between the [employee's] conduct and the efficiency of service."[5] *Figueroa*, 423 F. Supp. 3d at 33 (citing *Bryant v. NSF*, 105 F.3d 1414, 1414 (Fed. Cir. 1997); 5 U.S.C. § 7513(a)(1994)). In order to satisfy the nexus requirement, "the agency must establish that Plaintiff's misconduct would have an adverse impact on the agency's performance of its functions." *Shaw v. Dep't of Veterans Affairs*, No. 14-cv-5856, 2017 WL 5508914, at *1 (S.D.N.Y. Mar. 16, 2017), *aff'd sub nom. Shaw v. McDonald*, 715 Fed. App'x 60 (2d Cir 2018) (citing *Banks*, 25 Fed. App'x at 899-900); *see also Davis v. Dep't of Veterans Affairs*, 4 Fed. App'x 779, 781 (Fed. Cir. 2001) (holding that to satisfy this requirement, the agency "must establish a nexus" between a plaintiff's detrimental conduct and "the [agency's] performance of its functions.").

Based on the above case law, and the ALJ's affirmation of all but one of the 36 factual specifications alleged against Babin, *see* Dec. at 33, the Court concludes that the Government has established a sufficient nexus between the Plaintiff's charged

---

[5] "Efficiency of service" appears to be a term of art – the case law addresses how this test is fulfilled without necessarily defining what it is that is being fulfilled. *See, e.g., Banks v. Dep't of Veterans Affairs*, 25 Fed. App'x 897, 899-900 (Fed. Cir. 2001).

detrimental conduct and its effect on the OCC's mission.  In fact, given the evidence of Babin's failure to follow explicit written directions, insolence, and overall poor performance, it is impossible for the Court to reach any other conclusion.

      3.  <u>Reasonableness of Penalty</u>

The Court next evaluates whether the ALJ's affirmation of the OCC's removal of Plaintiff from federal employment is supported by substantial evidence.  This Court's review of a penalty determination is particularly deferential.  Initially, the disciplining agency – considering its own objectives and policies – decides the appropriate penalty for its employee, a decision that the ALJ only reviews to determine reasonableness.  *See Douglas*, 5 M.S.P.R. at 296-303; *Lachance v. Devall*, 178 F.3d 1246, 1251 (Fed. Cir. 1999); *Miguel v. Dep't of Army*, 727 F.2d 1081, 1083 (Fed. Cir. 1984) ("It is a well-established rule of civil service law that the penalty for employee misconduct is left to the sound discretion of the agency.").

In assessing the appropriateness of a penalty, courts typically consider the following, non-exhaustive, list of factors:  "(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the

offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that where violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others." *Douglas*, 5 M.S.P.R. at 305-06.

Applying these standards, the Court concludes that the ALJ's reasonableness review of the OCC's penalty determination is supported by substantial evidence. Initially, after she sustained the OCC's charges, the ALJ reviewed the penalty imposed on Babin to determine if the OCC had "considered all the relevant factors and exercised management discretion within tolerable limits of reasonableness." *See* Dec. at 33-34 (citing *Wentz v. U.S. Postal Service*, 91 M.S.P.R. 176, 183 (2002); *Douglas*, 5 M.S.P.R. at 306). In affirming the penalty's reasonableness, the ALJ explained that the OCC-issued decision letter, which advised Plaintiff of Morgan's decision to remove him from federal service, had considered and applied all relevant

25

"*Douglas* penalty considerations." Dec. at 33-34; *see also* Schumacher Decl. Exs. E (Notice of Proposal to Remove); F (Decision on Proposed Removal) at 3. The ALJ further weighed Morgan's live testimony that both the frequency and severity of Babin's misconduct, were significant factors in his decision to recommend Plaintiff's removal. *See* Dec. at 34. Morgan further testified that Babin's repeated "cutting and pasting" of others' work product into his own was particularly concerning, because the analysis of a bank examiner must be "robust and complete" in order for the regulatory process to be successful. *See id.* The ALJ next considered Morgan's testimony that Plaintiff failed to offer any defense to many of the specifications against him, refused to accept his mistakes, and showed no remorse. *See id.* Based on this testimony, the ALJ concluded that Morgan properly considered the *Douglas* factors, and that removal was not an unreasonable penalty. *See id.* at 34.

After a review of the ALJ's analysis, the Court concludes, despite Plaintiff's arguments to the contrary, that the penalty imposed by the OCC and affirmed by the ALJ was consistent with the *Douglas* factors, supported by substantial evidence, and not "wholly unwarranted" such that it should be overturned. *See Murray,* 821 F. Supp. at 110 (*quoting Krauthamer v. Block,* 587 F. Supp. 254, 257 (S.D.N.Y. 1984) ("The reviewing court must 'defer to the judgment of the agency as to the appropriate penalty for employee misconduct, unless its severity appears totally unwarranted.'")); *see also Shaw*, 2017 WL 5508914, at *6.

In reaching this conclusion, the Court rejects Babin's allegations that the ALJ erred in:  (i) failing to consider his past disciplinary history and work record; (ii)

26

rushing the case along; and (iii) not permitting Plaintiff to call certain witnesses. *See* Am. Compl. at 2-4. An ALJ's rulings on discovery prior to a hearing or evidentiary issues at the hearing are left "to the sound discretion of the board and its officials," and reviewing courts typically "will not overturn the board on such matters unless an abuse of discretion is clear and is harmful." *Chambers v. Dep't of Interior*, 515 F.3d 1362, 1371 (Fed. Cir. 2008) (internal quotation marks omitted). Moreover, Plaintiff does not dispute that: (a) he was permitted to, and did, submit substantial documentary evidence of his military record and decades-old prior employer evaluations, which were accorded appropriate weight by the ALJ; (b) both Babin and the Department were precluded from calling witnesses whose testimony was deemed cumulative and/or irrelevant; and (c) Plaintiff was not permitted to call a physician to testify because he had previously denied suffering from any limitation to any significant life function, rendering such testimony irrelevant. For these reasons, the Court concludes that Plaintiff has not established reversible error, and respectfully recommends that the ALJ's Decision should be affirmed in its entirety.

## B. **Plaintiff's Affirmative Claims**

The Court next turns to Babin's affirmative claims for disability discrimination and retaliation, which are before the Court as part of his "mixed case" pursuant to § 7703(c), and subject to a *de novo* scope of review. *See Figueroa*, 423 F. Supp. 3d at 28; *Fineman,* 555 F. Supp. at 1341. This scope of review, however, does not mitigate Plaintiff's burden to plead facts sufficient to establish both of his claims. *See Harris v. Sec. and Exch. Comm'n*, 972 F.3d 1307, 1320-21 (Fed. Cir. 2020). Notwithstanding

Plaintiff's *pro se* status, and based on a liberal reading of the Second Amended Complaint and Plaintiff's Opposition, the Court concludes that Babin has failed to establish *prima facie* cases for either claim. Accordingly, the Court respectfully recommends that Defendant's Motion be granted in its entirety, and that the Second Amended Complaint be dismissed with prejudice and without leave to replead.

### 1. Disability Discrimination

Initially, Babin alleges that he was discriminated against pursuant to: (i) Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and (ii) Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq*. *See* SAC at 2. Title I of the ADA provides that "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. Similarly, Section 504 of the Rehabilitation Act prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against "otherwise qualified" disabled individuals. 29 U.S.C. § 794(a).

To assert a claim under Title I of the ADA, a plaintiff must demonstrate: "(1) that his [or her] employer is subject to the ADA; (2) that he [or she] was disabled within the meaning of the ADA; (3) that he [or she] was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) that he [or she] suffered an adverse employment action due to his disability." *Billings*

*v. New York State Dep't of Corrections and Community Supervision*, No. 19-cv-11796, 2021 WL 4150925, at *9 (S.D.N.Y. Sept. 10, 2021) (internal quotations and citations omitted) (alterations in original).  Likewise, to sustain a claim under Section 504 of the Rehabilitation Act, a plaintiff must allege:  "(1) that [he] is a qualified individual with a disability; (2) that the defendants are subject to [the Rehabilitation Act] ; and (3) that [he] was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability."  *Doe v. Trustees of Columbia Univ. in City of New York*, No. 21-cv-1697, 2021 WL 1253974, at *4 (S.D.N.Y. Apr. 1, 2021) (quoting *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004)) (internal quotation marks and alterations omitted).  Importantly, however, a plaintiff who receives – and avails himself or herself – of a reasonable accommodation provided by a defendant, cannot sustain a disability discrimination claim against that defendant, under either the ADA or the Rehabilitation Act, without any other allegation or evidence of discrimination.  *See McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012), 700 F.3d at 640-41 (citing *Powell*, 364 F.3d at 85).

Applying these standards, the Court concludes that Babin's disability discrimination claim fails as a matter of law.  Initially, Plaintiff's ADA claim cannot survive because Title I of the ADA does not apply to employees of federal agencies.  *See Walsh v. Dejoy*, No. 14-cv-7239, 2021 WL 4896979, at *17 (S.D.N.Y. July 28, 2021), *report and recommendation adopted*, 2021 WL 4355366 (S.D.N.Y. Sept. 24, 2021) (dismissing plaintiff's ADA Title I claim against the Postmaster General

because the federal government is "explicitly excluded from the definition of employer by ADA's Title I."); *see also Sceravino v. Reno*, 8 Fed. App'x 87, 88 (2d Cir. 2001) (citing 42 U.S.C. §§ 12111(2), 12111(5)(B)(i)); *Nadel v. Shinseki*, 57 F. Supp. 3d 288, 294 (S.D.N.Y. 2014). Further, Babin's testimony at his MSPB hearing undercuts his Rehabilitation Act claim. Indeed, it is undisputed that Plaintiff maintained, during the MSPB hearing and in his alleged EEOC submission, that he was "willing and able to perform all of the duties related to [his] position as a Bank Examiner with the accommodate [*sic*]," which he "ha[d] been granted by the OCC and [his] OCC supervisors." Dec. at 36. Babin's admission that he was granted an accommodation by the OCC renders his disability discrimination claim defective as a matter of law. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 282 (2d Cir. 2003) (citing *Alexander v. Choate,* 469 U.S. 287, 301, 105 S. Ct. 712, 720-21 (1985)). Further, Plaintiff submits no other facts in support of this cause of action that would support a conclusion of discriminatory animus. Accordingly, the Court respectfully recommends that Babin's disability discrimination claim be dismissed with prejudice and without leave to replead.

2. Retaliation

Babin likewise fails to state a viable workplace retaliation cause of action which, based on his Opposition to Defendant's Motion, he seeks to bring under Title I of the ADA. Although the statute is silent on the issue, workplace retaliation is actionable under Title I of the ADA. *See Quadir v. New York State Dep't of Labor*, 39 F. Supp. 3d 528, 542 (S.D.N.Y. 2014); *see also* 42 U.S.C. § 12203(a) ("No person shall

discriminate against any individual because such individual…made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter").

To present a *prima facie* case of retaliation under Title I of the ADA, a plaintiff-employee must establish that: "(1) the employee was engaged in a protected activity; (2) the employer was aware of that activity; (3) an employment action adverse to the plaintiff occurred; and (4) there existed a causal connection between the protected activity and the adverse employment action." *Alexander v Cent. Islip School Dist.*, No. 18-cv-2521, 2021 WL 4340730, at *7-8 (E.D.N.Y. Sept. 22, 2021) (quoting *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2002)) (internal quotations omitted); *see also Castro v. City of N.Y.*, 24 F. Supp. 3d 250, 268 (E.D.N.Y. 2014). "In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of *McDonnell Douglas*." *Alexander*, 2021 WL 4340730, at *7 (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973); *McGuire-Welch v. House of the Good Shepherd*, 720 Fed. App'x 58, 62 (2d Cir. 2018). If all elements of a *prima facie* case are satisfied, the burden shifts to the employer to "proffer a legitimate non-discriminatory reason for its actions…." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014). The plaintiff must then "establish that the defendant's reason is in fact pretext" for the alleged retaliation. *Id.*

Notwithstanding the above case law, Babin's ADA retaliation cause of action fails as a matter of law because he is a former federal employee not covered by the

31

statute. *See Walsh*, 2021 WL 4896979, at \*17; *Sceravino*, 8 Fed. App'x at 88 (citing 42 U.S.C. §§ 12111(2), 12111(5)(B)(i)); *Nadel*, 57 F. Supp. 3d at 294. Accordingly, the Court recommends that Plaintiff's ADA retaliation claim also be dismissed with prejudice and without leave to replead.

### C. <u>Leave to Replead</u>

It is apparent at this juncture that further amendment of the Complaint would be futile, and the Court recommends that Babin not be granted an additional opportunity to replead his claims in a Third Amended Complaint. *See Beach v. Walter*, No. 18-cv-5722, 2019 WL 4640009, at \*4 (S.D.N.Y. Sept. 24, 2019) (denying *pro se* plaintiff the opportunity to file a third amended complaint because the issues with plaintiff's claims were "substantive" and could not be cured by "better pleading) (internal citation omitted); *Padmanabhan v. New York Inst. of Tech. Campus, New York*, No. 18-cv-5284, 2019 WL 4572194, at \*6 (S.D.N.Y. Sept. 20, 2019) (same).

### IV.    CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Defendant's Motion be granted in its entirety, and that the Complaint be dismissed with prejudice and without leave to replead.

### V.    OBJECTIONS

A copy of this Report and Recommendation is being served on Defendant by electronic filing on the date below. Defendant is directed to promptly serve a copy of this Report and Recommendation on Plaintiff and file proof of service. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within

14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-cv-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:     Central Islip, New York
           December 9, 2021

                              /s/ Steven I. Locke
                              STEVEN I. LOCKE
                              United States Magistrate Judge